IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

U S WEST COMMUNICATIONS, INC.,
a Colorado Corporation,

                Plaintiff,

v.                                                       Civ. No. 97-124 JP/JHG

ERIC SERNA, JEROME BLOCK, and
WILLIAM POPE, Commissioners of the
New Mexico State Corporation Commission;
and WESTERN WIRELESS CORPORATION,
a Washington Corporation,

                Defendants.

## MEMORANDUM OPINION AND ORDER

On January 19, 1999, Plaintiff US West Communications, Inc. ("U S West") filed its Motion for Summary Judgment (Doc. No. 69). After a careful review of the law and the briefs, I conclude that the Plaintiff's motion should be denied.

### I. Background

In the Telecommunications Act of 1996 ("the Act"), Congress enacted a plan to transform the monopolistic structure of local telephone service markets by helping to lower barriers to entry into those markets for new competitors. The Act effectively opens up local markets by imposing several new obligations on the existing providers of local telephone service in those markets. The Act refers to the current local providers such as U S West as "incumbent local exchange carriers" or "incumbent LECs." See §§ 47 U.S.C.A. 251(c), (h), 252(j) (West

Supp. 1999). Among other duties, the Act requires incumbent LECs to (1) allow other telecommunication carriers (such as cable television companies and current long-distance providers) to interconnect with the incumbent LEC's existing local network to provide competing local telephone service (interconnection); (2) provide other telecommunication carriers access to elements of the incumbent LEC's local network on an unbundled basis (unbundled access); and (3) sell to other telecommunication carriers, at wholesale rates, any telecommunications service that the incumbent LEC provides to its retail customers (resale). Id. § 251(c). Through these three duties, and the Act in general, Congress sought "to promote competition and reduce regulation in order to secure lower prices and higher quality services for American telecommunications consumers and encourage the rapid deployment of new telecommunications technologies." Telecommunications Act of 1996, Pub.L. No. 104-104, purpose statement, 110 Stat. 56, 56 (1996).

When a competing carrier asks an incumbent LEC to provide interconnection, unbundled access, or resale under the Act, both the incumbent LEC and the competing carrier have a duty to negotiate in good faith the terms and conditions of an agreement that accomplishes the Act's goals. §§47 U.S.C.A. 251(c)(1), 252(a)(1). Consequently, a company seeking to enter the local telephone service market, such as Defendant Western Wireless Corporation ("Western Wireless"), may request an incumbent LEC to provide it with any one or any combination of these three services. Alternatively, if the parties had a preexisting agreement, the competing carrier may petition the incumbent LEC to renegotiate the agreement under the Act. If the incumbent LEC and the carrier seeking entry are unable to reach a negotiated agreement, either party may petition the jurisdictive state utility commission to conduct a compulsory arbitration of the open and

disputed issues and arrive at an arbitrated agreement. See id. § 252(b). The final agreement between the incumbent LEC and the competing carrier, whether arrived at through negotiation or arbitration, must be approved by the state commission. Id. § 252(e)(1). A party may seek review of a state commission's decision in federal district court. Id. § 252(e)(6).

In this case, on March 29, 1996 Defendant Western Wireless (a competing carrier) made its request to U S West to negotiate an interconnection agreement and a reciprocal compensation arrangement. On September 6, 1996, after the parties failed to reach an agreement on all issues, Western Wireless filed a petition for arbitration with the New Mexico Public Regulatory Commission ("NMPRC"), which was then known as the New Mexico State Corporation Commission. On January 2, 1997, the NMPRC issued its Findings of Fact and Conclusions of Law and Order defining the terms of the interconnection agreement between U S West and Western Wireless. Record Proper at 506. On January 31, 1997, U S West filed its original Complaint in this court appealing the NMPRC's January 2, 1997 Order. In an Order entered March 5, 1997, the NMPRC adopted the Interconnection Agreement, Record Proper at 666, and on March 13, 1997, the NMPRC denied U S West's motion for rehearing. Record Proper at 673. Then, in a Memorandum Opinion and Order entered February 27, 1998, this court dismissed U S West's January 31, 1997 original Complaint for lack of jurisdiction because the NMPRC had not yet approved the Interconnection Agreement at the time the Complaint was filed. On March 10, 1998, U S West filed its First Amended Complaint.

## II.  Legal Standard

As I stated in the Memorandum Opinion and Order entered March 31, 1998, the standard of judicial review of the NMPRC's purely legal conclusions and determinations of procedural and

3

substantive compliance with federal law is *de novo*. I review the NMPRC's factual findings to determine whether they are arbitrary and capricious.

### III. Analysis

**A.  Interim Reciprocal Compensation**

On February 8, 1996, the Telecommunications Act of 1996 became law. On March 29, 1996, Western Wireless petitioned U S West to negotiate an interconnection agreement under the Act. Then, on August 8, 1996, the Federal Communications Commission ("FCC") issued administrative rules that implemented the Act. In re Implementation of Local Competition Provisions of the Telecommunications Act of 1996, First Report and Order, 11 FCC Rcd 15499 (1996) ("First Report and Order"). The First Report and Order filled in many of the gaps left by the Act, including the compensation that incumbent LEC's would receive for fulfilling their obligations under the Act. The FCC also promulgated a rule that states that, as of the date a competing carrier petitions an incumbent LEC to negotiate a new agreement until the time that an interconnection agreement is approved by the state, the competing carrier may charge the incumbent LEC the same rates for termination of telecommunications traffic that the incumbent LEC charged the competing carrier ("interim reciprocal compensation"). 47 C.F.R. § 51.717. In its Order entered January 2, 1997, the NMPRC applied the FCC's rule and determined that U S West must pay interim reciprocal compensation to Western Wireless beginning March 29, 1996, the date that Western Wireless informed U S West that it wished to renegotiate its interconnection agreement.

U S West argues that the NMPRC erred in requiring U S West to pay interim reciprocal compensation to Western Wireless beginning March 29, 1996. U S West argues that the

NMPRC's decision on this issue constitutes an improper retroactive application of 47 C.F.R. § 51.717, which went into effect *after* March 29, 1996.

However, as the NMPRC and Western Wireless correctly point out, U S West's duty to pay reciprocal compensation originated with the Act itself, which went into effect *before* March 29, 1996. The Act specifically imposes upon incumbent LECs "[t]he duty to establish reciprocal compensation arrangements for the transport and termination of telecommunications. 47 U.S.C. § 251(b)(5). Thus, the NMPRC's decision requiring U S West to pay reciprocal compensation as of March 29, 1996 was not a retroactive application of the law, because that duty predated Western Wireless' request.

Furthermore, the NMPRC was entitled to rely upon the FCC regulations in interpreting the Act, which is less than a model of clarity. See U S West Communications, Inc. v. Reinbold, A1-97-025, slip op. at 2 (D.N.D. May 14, 1999) ("[T]he timing of the rate application to begin on March 29, 1996, the date of request by Wireless, is a determination within the decision making authority of the arbiter. It is not an abuse of discretion to be guided by the directions contained in a rule not yet in effect.")

**B.     The Rate of Reciprocal Compensation**

U S West contends that the NMPRC's decision that U S West must compensate Western Wireless at the "tandem" switch rate, rather than at the "end office" switch rate, was arbitrary and capricious.

The Act requires incumbent LEC's to establish reciprocal compensation agreements for the transport and termination of telecommunications traffic on each other's networks. 47 U.S.C. § 251(b)(5). Under the Act,

5

> a State commission shall not consider the terms and conditions for reciprocal
> compensation to be just and reasonable unless—
> (i) such terms and conditions provide for the mutual and reciprocal recovery by
> each carrier of costs associated with the transport and termination on each carrier's
> network facilities of calls that originate on the network facilities of the other
> carrier; and
> (ii) such term and condition determine such costs on the basis of a reasonable
> approximation of the additional costs of terminating such calls.

47 U.S.C. § 252(d)(2)(A).

In this case, the NMPRC determined that Western Wireless should be compensated at U S West's "tandem rate" for terminating calls that originate on U S West's network. In the most simplified terms, a "tandem" switch is used to interconnect all "end offices" in a common geographic area. An "end office" switch, by contrast, generally connects calls from one caller to another within a smaller geographic area. The cost of tandem transport and termination is higher than that of end office switching.

In determining the rate of reciprocal compensation to be applied in this case, the NMPRC stated:

> Given the functionality and geographic scope of Western's network, the
> Commission finds that, on an interim basis, Western should receive compensation
> for the transport and termination of calls originated on US West's network
> equivalent to U S West's rate for tandem transport and termination. . . .
> Accordingly, the Commission finds that U S West's TELRIC costs are a
> reasonable approximation of Western's costs, and that U S WEST's
> interconnection rates should be applicable to Western as well.

Findings of Fact and Conclusions of Law and Order filed January 2, 1997, Record Proper at 515. <u>See</u> <u>also</u> Order on Motion for Rehearing entered March 13, 1997, Record Proper at 675-76.

U S West challenges this finding by the NMPRC on three grounds. First, U S West argues that the NMPRC erred in its reliance upon the FCC's rule of "geographic comparability"

because the rule was vacated by the Eighth Circuit Court of Appeals. Second, U S West contends that there is no evidence in the record to support a finding that the geographic scope of a switch is an appropriate proxy for its cost of operation. Third, U S West asserts that Western Wireless should not be compensated at U S West's tandem rate because Western's switch does not perform functions similar to those performed by U S West's tandem switch.

   *1. The Validity of the Rule of Geographic Comparability*

The rule of "geographic comparability" provides that "[w]here the switch of a carrier other than an incumbent LEC serves a geographic area comparable to the area served by the incumbent LEC's tandem switch, the appropriate rate for the carrier other than an incumbent LEC is the incumbent LEC's tandem interconnection rate." 47 C.F.R. § 51.711(a)(3) (1998). See also First Report and Order, 11 FCC Rcd 16042 (1996). U S West argues that the NMPRC's reliance upon this rule was arbitrary and capricious because the rule was vacated by the Eighth Circuit in Iowa Utilities Board v. FCC, 120 F.3d 753, 800 n.21 (8th Cir. 1997). However, the Supreme Court overruled the Eighth Circuit's decision vacating the geographic comparability rule. AT&T Corp. v. Iowa Utilities Board, 119 S.Ct. 721, 732-33 (1999).[1] Consequently, the NMPRC's reliance upon 47 C.F.R. § 51.711(a)(3) was not improper.

U S West does not appear to argue that the NMPRC lacked evidence on which it could conclude that Western Wireless' network served a geographic area similar to that of U S West's network. In fact, such evidence was presented to the NMPRC, which therefore had substantial

---

[1] In its reply brief, U S West acknowledges that the Supreme Court has reversed the Eighth Circuit on this issue. Instead, U S West proposes that this court await the outcome of a pending substantive challenge to the rule of geographical comparability. However, U S West does not specify when a decision is expected in that case.

7

evidence to support its conclusion that Western Wireless' network serves a geographic area similar to U S West's network.  See Transcript of Proceedings held December 10, 1996 at pp. 37-40, 44.

*2.    Geographic Scope of a Switch as an Appropriate Proxy for its Cost*

Second, U S West argues that the NMPRC erred because no evidence was presented, and the NMPRC did not find, that the geographic scope of Western Wireless' system as compared to U S West's tandem switch is an appropriate measure for Western Wireless' costs.  U S West also faults Western Wireless for failing to submit cost studies that prove its costs of switching telecommunications traffic.

U S West overlooks the plain language of the FCC's administrative rule, which provides that "[r]ates for transport and termination of local telecommunications traffic shall be symmetrical" except in certain narrow circumstances.  47 C.F.R. § 51.711(a) (1998).  See also First Report and Order, 11 FCC Rcd at 16040 ("[W]e conclude that it is reasonable to adopt the incumbent LEC's transport and termination prices as a presumptive proxy for other telecommunications carriers' additional costs of transport and termination.")  The rule clearly states that where, as here, the switch of another carrier serves a geographic area comparable to the area of the incumbent LEC's tandem switch, "the appropriate rate for the carrier . . . is the incumbent LEC's tandem interconnection rate."  47 C.F.R. § 51.711(a)(3).  See also First Report and Order, 11 FCC Rcd at 16042.  In short, because the FCC has established a presumption in favor of symmetrical rates where the geographic area served by the incumbent LEC and the competing carrier are the same, the NMPRC was not required to find that Western Wireless' actual costs were precisely identical to U S West's costs.

8

Furthermore, U S West's criticism of Western Wireless' failure to submit its own cost studies for the NMPRC's consideration is without merit. Under the regulations, Western Wireless is required to submit such cost studies only if it is seeking a rate of compensation that is higher than U S West's tandem rate. See 47 C.F.R. § 51.711(b). Western Wireless made clear that it did not submit cost studies because it was asking to be compensated at U S West's tandem rate, not a higher rate. See Transcript of Proceedings held December 10, 1996 at pp. 40-42.

    *3.    The Functions Performed by Western's Wireless' Switch*

U S West argues that Western Wireless should not be compensated at the tandem rate because Western Wireless' network cannot perform the same functions as U S West's tandem switch. However, U S West points no rule within the Code of Federal Regulations which requires the NMPRC to evaluate the comparative functionality of U S West's and Western Wireless' switching apparatus. The only discussion of functionality occurs in Paragraph 1090 of the FCC's First Report and Order, in which the FCC directs the states to evaluate the functions performed by a carrier's "new technologies" vis-a-vis the incumbent LEC's tandem switch. First Report and Order, 11 FCC Rcd 16042. However, even that discussion of functionality concludes with the directive that states should apply the geographic comparability rule.[2] Id. Consequently, it is

---

[2] The First Report and Order states:

> We find that the "additional costs incurred by a LEC when transporting and terminating a call that originated on a competing carrier's network are unlikely to vary depending on whether tandem switching is involved. We, therefore, conclude that states may establish transport and termination rates in the arbitration process that vary according to whether the traffic is routed through a tandem switch or directly to the end-office switch. In such event, states shall also consider whether new technologies (e.g., fiber ring or wireless networks) perform functions similar to those performed by an incumbent LEC's tandem switch and thus, whether some or all calls terminating on the new entrant's network should be priced the same as

9

unclear from the First Report and Order whether reciprocal compensation should be based on a finding of geographic comparability alone, or whether the state must also find functional comparability.

Ultimately, this question is moot because the NMPRC found that Western Wireless should be compensated at U S West's tandem rate based upon both "the functionality and geographic scope of Western's network." Record Proper at 515. As discussed above, there is substantial evidence in the record to support the NMPRC's application of the geographic comparability rule. Similarly, there is sufficient evidence in the record upon which the NMPRC could reasonably conclude that Western Wireless' system has functional equivalence to U S West's tandem switch. See Record Proper at 145-46, 359; Transcript of Proceedings held December 10, 1996 at pp. 37-49.

For all of these reasons, the NMPRC's decision was not arbitrary and capricious, and U S West's motion for summary judgment on this issue should be denied.

---

the sum of transport and termination via the incumbent LEC's tandem switch. Where the interconnecting carrier's switch serves a geographic area comparable to that served by the incumbent LEC's tandem switch, the appropriate proxy for the interconnecting carrier's additional costs is the LEC tandem interconnection rate.

First Report and Order, 11 FCC Rcd 16042.

## C. The Amount of US West's Traffic That is Terminated on Western Wireless' Network

Under the Act, U S West must pay Western Wireless reciprocal compensation for terminating calls that originate on U S West's network. See 47 U.S.C. § 252(d)(2)(A)(i). Similarly, Western Wireless must compensate U S West for terminating calls that emanate from Western Wireless' network. Id. According to U S West, it has the "SS7" technology to accurately record the actual amount of telecommunications traffic it receives from Western Wireless, and therefore the amount that Western Wireless must pay to U S West is not in dispute. Plaintiff's Brief at 14. However, U S West contends that Western Wireless' system does not have similar SS7 capabilities. Therefore, U S West has agreed that an "administrative factor" should be used as an approximation of the amount of U S West's traffic that is terminated by Western Wireless. Record Proper at 205; Plaintiff's Brief at 15.

The NMPRC concluded that an administrative factor of 24% was appropriate—that is, that U S West should be required to pay Western Wireless for terminating 24% of the total amount of telecommunications traffic between the two carriers. Record Proper at 515-16; 677. U S West argues that there is insufficient evidence in the record to support the imposition of an administrative factor of 24%, and argues that 17% (the amount proposed by U S West) is a more appropriate figure.

A review of the record reveals that neither U S West nor Western Wireless knows exactly how much of U S West's telecommunications traffic is terminated by Western Wireless. U S West complains that Western Wireless' proposed figure of 24% was "not New Mexico specific" but instead was "based on an average between the various PCS holding[s] of Western in Salt Lake

11

City, Portland, and Hawaii." Plaintiff's Brief at 16; Transcript of Proceedings held December 10 at 107-09. U S West also argues that Western Wireless' study was probably based on the number of calls made rather than on minutes of use, and therefore does not reflect actual traffic levels. Plaintiff's Brief at 16.

On the other hand, U S West's proposed administrative factor of 17% is based upon a traffic sampling done by U S West and another competing carrier in Arizona and New Mexico. Plaintiff's Brief at 15-16; see Transcript of Proceedings held December 10 at 169-70. Therefore, like that of Western Wireless, U S West's study does not measure the amount of telecommunications traffic that begins with U S West and is terminated by Western Wireless in New Mexico. U S West trumpets the fact that five other providers of mobile telephone services have accepted an administrative factor of 17% based upon this study. Plaintiff's Brief at 16; Record Proper at 207. However, that fact does not advance the inquiry into the amount of traffic that Western terminates on U S West's behalf, and may only reflect the other competing carriers' unwillingness to dispute the issue with U S West.

Overlaying these two studies is the testimony of Brian Kirkpatrick, who testified that an administrative proxy of 24% is probably conservative, because it is based on Western Wireless' cellular market only and does not include its PCS services. Transcript of Hearing held December 10, 1996 at 33-34; 70. Similarly, Andrew Nenninger testified that Western Wireless' PCS operations in other states generally terminate about 46% of the traffic that begins on land-based phone systems. Id. at 107-09.

In its Order on Rehearing entered March 13, 1997, the NMPRC explained that it had concluded that an administrative factor of 24% was a "reasonable resolution" to the dispute

12

where both sides challenged the validity of the others' proposed percentages, which ranged from 17% to 46%. Record Proper at 677. Given the limited and conflicting information provided to the NMPRC by the parties, I cannot say that the NMPRC's decision to impose an administrative factor of 24% was arbitrary and capricious.

D.     **Unconstitutional Taking of U S West's Property**

U S West claims that the NMPRC's decision to (1) require U S West to pay Western Wireless reciprocal interim compensation beginning March 29, 1996; (2) compel U S West to compensate Western Wireless at the "tandem" rate; and (3) apply an administrative factor of 24% for calls originating on U S West's network that are terminated by Western Wireless, amounts to an unconstitutional taking in violation of the Fifth and Fourteenth Amendments to the United States Constitution. Because I conclude that the NMPRC's decision on each of these issues was proper, U S West's motion for summary judgment on this claim should be denied.

**IT IS THEREFORE ORDERED** that Plaintiff US West's Motion for Summary Judgment (Doc. No. 69) is DENIED.

_____
**UNITED STATES DISTRICT JUDGE**